**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | |
|---|---|
| BENEFICIENT *and* BRAD HEPPNER<br><br>                    Plaintiffs,<br><br>       v.<br><br>DOW JONES & CO., INC.<br><br>                    Defendant. | Civil Action No. _____ |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Beneficient and Brad Heppner, in support of their Complaint against Defendant Dow Jones & Company, Inc.,[1] state the following:

## NATURE OF THE ACTION

1.      This action is the result of a defamatory campaign by *The Wall Street Journal* ("*The Journal*") and its reporter Alexander Gladstone to damage and defame Plaintiffs Brad Heppner and Beneficient through a series of deliberately sensationalized and irresponsible articles and tweets.  Heppner and Beneficient, the company he founded, are pioneers in the alternative asset space and, like all entrepreneurs and enterprises that build an entirely new market segment from the ground up, have done so through novel (and sometimes complex) transactions.  Plaintiffs, through their representatives, have repeatedly explained these transactions and Beneficient's business to Gladstone and *The Journal* over dozens of hours.

2.      However, instead of reporting fairly on what they learned, *The Journal* has purposefully disregarded critical facts, distorted critical timelines, and cherry-picked the

---

[1] Defendant Dow Jones & Co., Inc. is the publisher of *The Wall Street Journal*, among many other publications.  For simplicity, "Dow Jones" and "*The Journal*" are used interchangeably herein.

information they have received to promote an overarching, pre-ordained conclusion:  Brad Heppner, through his control of Beneficient and other companies, engineered self-serving transactions to enrich himself—and maintain a so-called "lavish lifestyle"—at the expense of vulnerable and elderly "retail" investors.  That is false.  *The Journal* knows it is false.  Gladstone's editors knew it was false.  And Plaintiffs can prove it is false.

3.      On July 29, 2022, *The Journal* published an article entitled, "An Asset-Management Merger Ended in Bankruptcy, While Its Architect Got $174 Million" (the "Article"). Separately, Gladstone published a tweet promoting the Article.[2]  Both the July 29 Article and the defamatory tweet lead with a picture of the supposed payoff of the supposed scheme: an operating ranch in Anderson County, Texas.

4.      In the Article, *The Journal* asserts that this Ranch was paid for through a "transfer" of $230 million from the now-bankrupt GWG to Beneficient, two companies that Gladstone and *The Journal* allege Heppner controlled.  *The Journal* claims that the so-called "transfer" of funds from the GWG transaction to Beneficient allowed Heppner to gain "access" to "private jets and other benefits."  *The Journal* further alleges that Heppner is misusing corporate funds for his personal gain and that he has a history of taking other people's money.  The vehicle for such alleged corporate misbehavior is Beneficient, who *The Journal* paints as Heppner's personal fiefdom.  In other words, *The Journal* accuses Heppner and Beneficient of misusing corporate funds to enrich Heppner, saddling elderly retail investors with billions in losses.

5.      This is false and defamatory.  To make Heppner and Beneficient look as though they had engaged in self-dealing "transfers" of money from hapless retail investors to "fund his

---

[2] A true and accurate copy Gladstone's July 29, 2022 defamatory tweet promoting the Article is attached as **Exhibit A**.

lavish lifestyle," *The Journal* intentionally distorts the timeline of these events, knowingly misrepresents facts, and deliberately omits critical details and context that contradict his preconceived narrative.  Neither Heppner nor Beneficient engaged in any such "transfer[]" of money to the detriment of investors.

6.      In actuality, and as explained below, GWG made successful investments in Beneficient that, at the time of the Article and Gladstone's tweet, had made GWG (and its investors) a significant positive return, contrary to *The Journal's* defamatory implications. Similarly, Heppner and Beneficient have not used the transactions to allow Heppner to access a "lavish lifestyle," such as buying the Ranch or using private jets.  Indeed, contrary to *The Journal's* insinuations, Heppner is a successful businessman who purchased the Ranch almost twenty years ago—long before the transactions involving Beneficient—and has owned and used private jets for many years.[3]

7.      *The Journal* published these falsehoods with actual malice.  Heppner's and Beneficient's representatives repeatedly notified Gladstone and *The Journal* of specific factual errors in his Article both before and after its publication, yet they rejected this information and the proposed corrections to serve their preconceived agenda of enticing readers with salacious half-truths, misleading implications, and a pre-conceived narrative in which Heppner and Beneficient stole from the elderly in order to buy a ranch and fly on private jets.  *The Journal* published these falsehoods with actual malice. Heppner's and Beneficient's representatives repeatedly notified Gladstone and *The Journal* of specific factual errors in the Article both before and after its publication, yet *The Journal* rejected this information and the proposed corrections to serve its preconceived agenda of enticing readers with salacious half-truths, misleading implications, and a

---

[3] The Ranch, located in the Eastern District of Texas, was originally purchased in 2003.

3

pre-conceived narrative in which Heppner and Beneficient stole from the elderly in order to buy a ranch and fly on private jets.  Since publication, Gladstone and *The Journal* have continued their crusade against Beneficient and Heppner, republishing the false implications in additional articles.

8. The predictable outcome is that third parties have concluded that the falsehoods in the Article and tweet are true, that Heppner is indeed a crook and a criminal, and that Beneficient is a sham.  Third parties have expressed these views publicly on social media.

9. Just as predictably, Heppner and Beneficient have suffered significant real-world damage apart from the conclusions of those on the internet.  As explained in full below, Beneficient and Heppner (currently serving as Beneficient's CEO) provide custodial and trust services and unlock liquidity for high-net-worth individuals and institutional investors, a service that requires the utmost trust of their clients and the confidence of many regulatory agencies.  False allegations that Beneficient is a dishonest enterprise run by a dishonest CEO therefore strike at the heart of the business and Heppner's livelihood.  Beneficient's and Heppner's reputations in the eyes of prospective investors and business partners have been seriously harmed by Gladstone's and *The Journal's* false and defamatory claims.

10. Almost a full year later, *The Journal* and Gladstone published another false and defamatory article on Beneficient and Brad Heppner entitled "$2 Billion Default Followed Warnings to Everyone but Investors" ("The 2023 Article").[4]  The 2023 Article prominently linked to all the false and defamatory coverage that *The Journal* and Gladstone had authored on the subject, including linking to the Article in its entirety in its first full paragraph.  By doing so, *The*

---

[4] Alexander Gladstone, *$2 Billion Default Followed Warnings to Everyone but Investors*, The Wall Street Journal (July 28, 2023), https://www.wsj.com/articles/2-billion-default-followed-warnings-to-everyone-but-investors-fbf13873.

*Journal* had the explicit purpose of republishing the Article for a different audience, leading them to first learn about the litany of false allegations in the original Article.

11.     Heppner and Beneficient bring this suit to vindicate their rights under civil law, to restore their reputations as upstanding providers of innovative alternative asset management services, to restore Heppner's reputation as an upstanding member of the business community, and to establish *The Journal's* liability for the harm that his false and defamatory statements have caused Plaintiffs.

12.     Heppner and Beneficient seek an award of compensatory damages for reputational and economic harm they have suffered, and, given the willful and malicious nature of *The Journal's* conduct in knowingly publishing defamatory falsehoods about them, Plaintiffs seek an award of punitive damages.

## PARTIES

13.     Plaintiff Brad Heppner lives in Dallas Texas but spends a significant portion of his time at the Bradley Oaks Ranch in Anderson County, Texas.  Among other roles, Heppner is the Founder, Chief Executive Officer and Chairman of the Board of Plaintiff Beneficient.  Heppner is a philanthropist and entrepreneur with over thirty years of experience in some of the world's most widely respected financial institutions.

14.     Plaintiff Beneficient is a corporation incorporated under the laws of Nevada with its primary place of business in Dallas, Texas.  Beneficient is a pioneering alternative asset company that provides regulated and examined private trust solutions and custodial management for fiduciary financial transactions, and which focuses on unlocking liquidity for individuals and businesses.  Beneficient's subsidiaries are regulated and examined by banking regulators, the

SEC,[5] and FINRA, which monitor articles in *The Journal* reporting on regulated businesses such as Beneficient.

15.     Non-Party Alexander Gladstone is a resident of, and is domiciled in, New York, New York.  Gladstone is a reporter for *The Wall Street Journal*, and covers financial distress, volatility, credit defaults, and restructuring, among other topics.

16.     Defendant Dow Jones & Company, Inc. is a corporation incorporated under the laws of the state of Delaware with its primary place of business in New York.  It is the publisher of a variety of newspapers, including *The Wall Street Journal*, and is a wholly-owned subsidiary of non-party News Corporation.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.

18.     This Court has personal jurisdiction over Defendant pursuant to Tex. Civ. Prac. & Rem. Code § 17.042, which extends jurisdiction to the full extent possible under the Due Process Clause of the United States Constitution, under subsection (2) because Defendant injured Heppner and Beneficient and their reputations in Texas.  Defendant published defamatory statements about Heppner, Beneficient, and its operations to be viewed in Texas, and thus committed a tort in the state of Texas.

19.     This Court has personal jurisdiction over Defendant because it expressly aimed and purposefully directed defamatory statements at Heppner and Beneficient, a Texas resident and a corporation with its primary place of business in Texas, respectively, knowing that the impact

---

[5] In the Article, Gladstone and *The Journal* reference a Securities and Exchange Commission investigation of Beneficient as evidence of potential wrongdoing; that investigation was recently terminated without a recommendation of any enforcement action; *see* https://www.trustben.com/insights/beneficient-announces-termination-of-sec-investigation/

would be felt in Texas.  On behalf of Defendant Dow Jones, Gladstone traveled to Texas to interview Heppner in person and, upon information and belief, also has traveled separately to the Bradley Oaks Ranch in Anderson County, Texas in connection with his reporting on Heppner and Beneficient.  Notably, the defamatory statements at issue in this action relate directly to the Bradley Oaks Ranch in Texas, and a picture of the Ranch is featured prominently next to the headline of Gladstone's Article and in his tweet.  By publishing his defamatory statements *The Journal's* website, Dow Jones knowingly and intentionally published defamatory statements to the public in Texas.  In addition, *The Journal* published defamatory statements of and concerning Heppner, a Texas resident; Beneficient, a company with its principal base of operations in Texas; the Bradley Oaks Ranch, which is located in Texas; and Heppner's and Beneficient's activities in Texas, all using information derived from Texas-based sources.

20.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this district, because Heppner and Beneficient suffered economic and reputational harm in this district, because the defamatory statements were published in this district, because a substantial part of property that is subject of the action (the Bradley Oaks Ranch) is located in this district, and because Defendant is subject to the Court's personal jurisdiction in this district.

### FACTS

**Brad Heppner Builds A Strong Reputation As A Leader In
The Financial Services And Alternative Asset Industries,
And As A Philanthropist And Entrepreneur.**

21.     Brad Heppner is a leader in the financial services industry, with more than 30 years of leadership and entrepreneurial experience in finance and alternative asset management, where he has founded more than ten companies.

22.     Heppner earned a BBA, BBS, and BA from Southern Methodist University in Dallas, Texas and a Master of Management from the Kellogg School at Northwestern University in Evanston, Illinois.  Heppner has held positions at the John D. and Catherine T. MacArthur charitable foundation and Bain & Company.

23.     Heppner has founded more than ten companies, including Constitution Private Capital Company, L.L.C., Capital Analytics, and The Crossroads Group, L.P., the last of which he sold to Lehman Brothers.  Capital Analytics is now held by Mitsubishi Union Financial Group, the subsidiary one of the world's largest banks located in Japan.

24.     Heppner is a frequent author on the evolution of the financial services industry, inventor of seven patent-pending technologies for the industry, trailblazer, and innovator in the alternative asset sector of the financial services industry.

25.     In addition to his leadership in the alternative asset sector, Heppner is also a philanthropist who has donated his time and money to public service.

26.     Heppner was a founder and former director of his Kansas hometown's Community Foundation, and currently serves on the advisory board of the Cox School of Business at Southern Methodist University.

27.     Heppner was behind the organization of the Kansas Economic Growth Trust and founded the Beneficient Heartland Foundation, which in the last year have collectively generated nearly $18 million in cash and assets for the benefit of Kansas-based colleges and universities and small rural hometowns located in the principally agricultural counties of Kansas.  These funds have been dedicated toward economic development in struggling communities such as the development and re-opening of community-based grocery stores.

**Beneficient Is A Pioneer
In The Alternate Asset Industry**

28.    Heppner began building what is now known as Beneficient in 2003, which is today focused on creating a more investor-friendly and regulated approach to alternative asset supervision, management, and liquidity.   Heppner is the Founder, Chairman, and CEO of Beneficient.

29.    Beneficient's business includes serving as a regulated and examined fiduciary and trustee, providing custodial and trust services in fiduciary financial transactions, and unlocking liquidity for high-net-worth and institutional owners of illiquid, alternative assets, such as ownership in private equity companies.

30.    The services Beneficient and Heppner provide are highly valuable to institutions and individuals who own alternative assets because it is often difficult for those owners to access such regulated fiduciary services and liquidity during lock-up periods or other contractual restrictions.  To address this issue, Beneficient offers a variety of services, including regulated and examined services in fiduciary financial transactions for fiduciary and trustee oversight, trust and fund administration, custody services, and insurance services.  Beneficient primarily serves high-net-worth individuals, smaller institutions, and asset managers.

31.    For Beneficient to succeed, it is essential that both Heppner and Beneficient maintain reputations of trustworthiness and fiduciary carefulness, as Beneficient engages in complex financial transactions that often comprise a meaningful allocation of a high-net-worth individual's net worth.  In fact, the company's website is "Trustben.com."

32.    From its founding until 2017, Beneficient was part of a closely held, family-owned company that owned or controlled Heppner's family office and a variety of investment assets in

addition to the asset liquidity business.  During that period, Beneficient owned investment assets (including the Ranch) as well as the alternative asset-focused operating business.

33.     However, as Beneficient grew and sought investment from large industry-recognized institutional third parties, it became necessary to separate its Beneficient operations from Heppner's family office and the numerous other investment assets.

34.     Beneficient's third party investors insisted on the formal separation of Beneficient's operating business from its investment assets such as the Ranch and Heppner's family office.  As a result, assets, operations, and investments unrelated to Beneficient's core business model, including the Ranch, were distributed to entities associated with Heppner, but not to Heppner himself.

35.     The separation of these assets was agreed to, and in fact insisted upon, by large third-party institutional investors in connection with Beneficient's formative transaction in 2017 and subsequently reviewed and audited by a special committee of Beneficient's Board of Directors, who had their own outside counsel, as well as Beneficient's audit committee and third-party auditors, including the regional auditing firm of Whitley Penn as well as Deloitte, the nation's largest accounting firm.  The third-party transactions that included the separation of the assets were also disclosed in audited financial statements filed with Securities and Exchange Commission as early as 2018.

**GWG Holdings Makes Successful Investment In Beneficient**

36.     GWG Holdings ("GWG") is a publicly traded company based in Dallas, Texas, whose historical business was primarily buying life insurance policies in the secondary market. By doing so, it allowed thousands of holders of life insurance policies to avoid "surrendering" their policies back to the issuer in exchange for a very small "surrender value."

37.     Between 2012 and 2021, GWG sold public debt securities, called "L Bonds," to raise capital to run its ongoing business and to purchase life insurance policies.  GWG fully disclosed the risks of buying L Bonds to investors, including explicitly stating that they were high risk and that there was a chance that the investor could lose the entire principal.

38.     In January 2018, GWG decided to invest in Beneficient for several reasons, including to diversify its business.  This investment decision was fully disclosed and was made by an independent board of directors of GWG that evaluated the decision beforehand.

39.     GWG's business, including its sale of L Bonds, existed for more than five years before Heppner was introduced to GWG in 2017.  Heppner, Beneficient, its Board of Directors and all affiliates had no prior knowledge of GWG, its founders, Board of Directors or management prior to the months leading up to GWG's decision to invest in Beneficient.

40.     GWG has invested approximately $230 million of cash in Beneficient net of cash realizations and distributions to GWG.  At the time of Gladstone's Article and tweet, the GWG investment in Beneficient was substantially more than the amount invested.  In other words, the GWG investment in Beneficient was highly successful.

41.     In April 2019, Heppner joined GWG's board as chairman, which is one board seat on a multi-member board.  Heppner never made any investment in GWG, and at no point in time did Beneficient or Heppner ever control GWG or own or control a majority of GWG's equity.

42.     Following the appointment of Beneficient representatives to the board of GWG, special governance provisions were enacted to ensure that there was independent review, excluding Heppner and members of Beneficient's Board and management teams, of any investment transactions that might occur between GWG and Beneficient.

43.     In December 2019, GWG acquired the non-transferable contractual right to appoint the majority of the board of directors of Beneficient.

44.     From December 2019 to December 2021, Beneficient was controlled by GWG and a consolidated operating subsidiary of GWG.  GWG was not controlled by Beneficient or Heppner during this time and has never been controlled by either of them.

45.     Special committees of GWG that Heppner was not a member of decided to make additional investments in Beneficient between the end of 2019 and early 2021 amounting to the net cash amount of $230 million.  GWG's investment in Beneficient, at the time of Gladstone's Article and tweet, was worth substantially more than the principal invested.

46.     Despite its successful investments in Beneficient, and due to other issues primarily related to the historical life insurance business and bond issuance program, GWG filed for chapter 11 bankruptcy in April 2022, after Heppner and other members of Beneficient's Board of Directors had departed the GWG Board to address concerns raised by state officials assisting in the chartering of certain of Beneficient's regulated business lines.

### Gladstone And *The Journal* Contact Heppner And Beneficient Regarding A Proposed *Wall Street Journal* Article

47.     On July 22, 2022, just 7 days before *The Journal* ultimately published the Article about Plaintiffs that is the subject of this action, Gladstone contacted Heppner's and Beneficient's representatives, asking that his message be directed to Heppner, a Texas resident.

48.     In this message, Gladstone included a list of supposed "facts" about Heppner and Beneficient that he had "determined," and stated that he was giving them an opportunity "to comment or provide insight[]."  Gladstone suggested they contact him if there was anything "factually incorrect," or if they wished to provide "context."

49.     Gladstone's so-called "facts" included defamatory falsehoods and false implications that Beneficient's and Heppner's representatives tried hard to educate Gladstone to correct, to no avail.

50.     For example, Gladstone had already fixated on the "expensive" so-called "lifestyle" that Heppner supposedly leads—and that Beneficient allegedly wrongfully enabled—as a focal point of the story, including the Ranch.

51.     Despite the fact that many of those falsehoods were specifically disproven by Heppner's and Beneficient's representatives before publication, Gladstone and *The Journal* persisted in publishing these false claims.  Similarly, Beneficient and its representatives have continued to point out specific defamatory falsehoods in the Article after it was published, but Gladstone and and *The Journal* have instead doubled down, defending the story and refusing to alter or retract it.

52.     Gladstone's and *The Journal's* unwillingness to deviate from those falsehoods when they were pointed out as untrue demonstrate that he had a false, preconceived narrative that they wished to present about Heppner and Beneficient from the outset, and that they had no interest in reporting facts.

### Heppner, Beneficient, And Their Representatives Inform Gladstone And *The Journal* Of Serious Errors In The Article Prior To Publication

53.     The same day, shortly after receiving Gladstone's email with his list of defamatory falsehoods about Heppner and Beneficient, a representative of Plaintiffs notified Gladstone that his email contained items "portrayed without context," and that "some of the insinuated conclusions are not only misleading but materially false.  There are also numerous factual inaccuracies throughout."

54.     The representative further advised Gladstone that "it appears your source may have given you an internal document that is either is not genuine, incomplete or has otherwise been altered to omit key details and/or other information."  The source of the information correcting Mr. Gladstone was Heppner, who is based in Texas.

55.     Despite receiving these communications from the representative, Gladstone responded on July 22, 2022 by doubling down on the false "facts" that he had listed about Heppner and Beneficient in his first email, and purporting to detail how he had arrived at some of the figures he had previously mentioned.  Gladstone then reiterated that "if Heppner believes that anything is inaccurate, he is free to call me," despite the fact that Gladstone and *The Journal* had already been informed that much of the information presented was inaccurate or misleading.

56.     On July 23, 2022, Plaintiffs' representative wrote again to Gladstone, informing him that he was missing "a number of key facts that would provide the proper context."[6]  The email went on to provide Gladstone with some of those facts, including that Heppner "has also voluntarily taken $234 million of complete waivers of cash and $26 million deferrals of cash owed to him from the combined companies over the prior three years."

57.     Plaintiffs' representative explained that this key context demonstrated that "to say that [Heppner] was funding his lifestyle through L bond proceeds" he received from Beneficient "is patently false."  Critically, Plaintiffs' representative also specifically stated that "the ranch you mention was purchased in 2003, *16 years* before the formative transaction with GWG[]."

58.     As also noted in July 23 email, most of the information that Plaintiffs' representative provided to Gladstone and *The Journal* was "a matter of public record," and that

---

[6] A true and accurate copy of the July 23, 2022 email from Heppner's representative to Gladstone is attached as **Exhibit B**.

"to the extent that [the] narrative is being informed by a source, it is apparent that the source is selectively providing you information based on some personal motivation to do [Heppner] and Ben[eficient] harm versus a vested interest in complete and accurate reporting of the facts."

59.     On July 25, 2022, Plaintiffs' representative again emailed Gladstone and provided him with a detailed chart providing corrections and context to Gladstone's defamatory allegations. This July 25 email also copied Andrew Scurria, the bureau chief for bankruptcy and financial distress reporting at *The Journal*.  Plaintiffs' representative advised Gladstone and Scurria that the "story is focused on a limited number of cash flows that advance your narrative, rather than all cash flows that paint the full picture."[7]

60.     As just one example, this July 25, 2022 chart explained that Gladstone's claim that technology assets sold to Beneficient were "over a decade old, and were soon written off," was misleading because those assets "are currently in use and still part of Ben[eficient]'s internal IT stack and infrastructure."  In other words, the technology assets that would later become part of Gladstone's defamatory reporting were still in use and still valuable and were written off only for accounting purposes.

61.     Plaintiffs' representative also expressed his disappointment that Gladstone had "denied [a] request for more time to respond in good faith to your questions," despite the fact that Gladstone was writing about "highly technical material relating to complex transactions that took place many years ago," which would require "dig[ging] through historic documents and assembl[ing] several people to get accurate and complete answers," and despite the fact that "there is no competition on this story, and no news peg."

---

[7] A true and accurate copy of the July 25, 2022 email from Plaintiffs' representative to Gladstone, including the chart refuting the false claims in Gladstone's outreach, is attached as **Exhibit C**.

62.     On July 26, 2022, Gladstone followed up by arguing against the additional facts and context that he had been provided by email—rather than acknowledging the facts.

63.     On July 27, 2022, Plaintiffs' representative sent Gladstone and Scurria yet another detailed chart that contained necessary context and material facts for Gladstone's reporting.  This email explained that Heppner and Beneficient "continue to maintain that your narrative lacks critical details and insinuates false conclusions."[8]

64.     This second chart likewise refuted several misleading and out-of-context statements offered by Gladstone.

65.     For example, the July 27, 2022 chart explained that, contrary to Gladstone's assertion that Beneficient had "take[n]" "$230 million from GWG," GWG's independent board had invested that money into Beneficient to gain exposure to a diversified pool of assets, and to simply state that Beneficient had "taken" those funds (which implies an exchange for no value) was misleading—particularly given that the then-current value of the investment was *greater* than the initial $230 million.

66.     On July 28, 2022, Heppner's and Beneficient's representative sent a *third* chart to Gladstone and Scurria, which explained, critically, that Gladstone's characterization of the interactions between GWG and Beneficient—and the accompanying investment in Beneficient's business—as "Heppner's takeover" of GWG was "blatantly false."[9]

67.     This is because, as explained in the July 28, 2022 chart, 1) GWG had decided to invest in Beneficient as part of a larger strategy to diversify *before* Heppner became chairman of

---

[8] A true and accurate copy of the July 27, 2022 email from Plaintiffs' representative to Gladstone, including the chart refuting the false claims in Gladstone's outreach, is attached as **Exhibit D**.

[9] A true and accurate copy of the July 28, 2022 email from Plaintiffs' representative to Gladstone, including the chart refuting the false claims in Gladstone's outreach, is attached as **Exhibit E**.

GWG's board, 2) special committees of independent directors (which excluded Heppner) approved the investments in Beneficient, meaning Heppner never had control or approval rights over those transactions, and 3) another entity (Paul Capital and its designees), not Heppner, had control of Beneficient, and it was the board, not Heppner, that determined who would be appointed to GWG's board—this was not a decision made by Heppner.

68.     On July 28, 2022, Plaintiffs' representative sent another email to Gladstone and Scurria, explaining that "no money has gone to Heppner nor his immediate or extended family members.  It has gone to affiliated and related entities and has been disclosed as such."  Again, the source of this information (and all the information in the correspondence above) was Heppner, who was based in Texas.

*The Journal* **Knowingly Disregards The Facts And Publishes A
False And Defamatory Article Anyway**

69.     On July 29, 2022, despite knowing that the Gladstone's "reporting" contained false and defamatory statements and implications, especially in light of the communications they had exchanged with Plaintiffs' representative, Gladstone and *The Journal* published an article in *The Journal* titled, "An Asset-Management Merger Ended in Bankruptcy, While Its Architect Got $174 Million" (the "Article").[10]

70.     The Article uses a combination of outright falsehoods, half-truths, and juxtaposed facts to create a misleading, false, and defamatory impression about Heppner, Beneficient, and its activities in Texas:  namely, that they improperly gained control of money from others, including from "elderly and retired" "retail investors," using Heppner's position at multiple companies and

---

[10] Alexander Gladstone, *An Asset-Management Merger Ended in Bankruptcy, While Its Architect Got $174 Million*, The Wall Street Journal (July 29, 2022), https://www.wsj.com/articles/an-asset-management-merger-ended-in-bankruptcy-while-its-architect-got-174-million-11659103557.

improperly used those funds to personally enrich Heppner and enable his supposedly "lavish" lifestyle, including his purchase of the Ranch and the use of private jets.

71.     Gladstone and *The Journal* begin the Article by falsely stating that Heppner became GWG's Chairman by "promis[ing] to reinvigorate the company."  This is false because no such promise was made.

> Dallas-based entrepreneur Brad Heppner became chairman of life-settlement business GWG Holdings Inc. promising to reinvigorate the company by pivoting into new alternative asset classes.
>
> Instead, Mr. Heppner and other business entities he is involved with collected at least $174 million in cash, loan repayments and other benefits as a result of the takeover of GWG that he engineered before the company collapsed in April, leaving thousands of individual investors owed $1.3 billion, a Wall Street Journal review found.

72.     Gladstone and *The Journal* juxtapose this supposed "promise" in the next paragraph with the word "instead," followed by the allegation that Heppner "collected . . . $174 million in cash . . . as a result of the takeover of GWG that he engineered" before it collapsed.

73.     The clear juxtaposition between the word "promise" and the word "instead" implies that Heppner broke the (non-existent) promise to reinvigorate the company.  According to the Article, the result of Heppner's actions was that he "le[ft] thousands of individual investors" owing more than a billion dollars.

74.     Gladstone and *The Journal* continue the defamatory insinuations in the next paragraph.

> Mr. Heppner and his associates gained effective control of GWG in
> 2019, as he sought to tap into a nationwide network of broker-dealers
> that had sold the company's bonds for years to individual investors,
> many of them elderly and retired, according to people familiar with Mr.
> Heppner's strategy. After Mr. Heppner became GWG's chairman, the
> company used that network to ramp up its bond sales. As it repaid some
> earlier investors, GWG also transferred $230 million to Beneficient Co.
> Group LP, a financial-services startup founded and led by Mr. Heppner.

75.     This paragraph asserts that it was Heppner's "strategy" once "gain[ing] effective control of GWG in 2019" to "ramp up" bonds sales to elderly and retired individual investors, and then to orchestrate a "transfer[]" of $230 million to Beneficient.

76.     Again, these statements are false and designed to give a false impression. As stated before, no corporate action of GWG was "Heppner's strategy" because he was only one board member of GWG and not a member of GWG's management. Each portion of the misleading impression is detailed below.

77.     **So-called "control."** The allegations that Heppner "engineered a takeover" of GWG (from the second paragraph) and that he "gained effective control" of GWG (from the third) are each false. At no point did Heppner ever control GWG or own or control a majority of GWG's equity. Heppner did not begin serving on GWG's board until April 2019, and he never had any more voting rights as compared to any other director. Indeed, he held fewer voting rights than other directors who served on the GWG's special committees, as it relates to the determination of whether GWG ever invested any cash into Beneficient.

78.     These false statements are designed to give the impression that Heppner was pulling the strings of GWG while it "transferred" money to Beneficient, and that Beneficient was merely a vehicle for Heppner's self-enrichment.

79.     These false implications are consistent with the overall gist of the Article, which is that Beneficient improperly obtained funds from GWG that it then wrongfully distributed to

Heppner to enable his self-enrichment scheme and his "lavish" lifestyle, all at the expense of "elderly and retired" retail investors.

80.     **"Transfer" of funds.**  Similarly, Gladstone's and *The Journal's* intentional use of the word "transfer" when referring to money flowing to Beneficient from GWG is critical and misleading, as the use of the word "transfer" implies that Beneficient improperly obtained GWG's money as the result of an improper or illegitimate transaction orchestrated by Heppner and executed by Beneficient.

81.     In actuality, GWG invested in Beneficient as part of a publicly disclosed business strategy, and GWG's investment in Beneficient, at the time of the Article and Gladstone's tweet, was worth substantially more than the principal invested.

82.     But the Article's reference to a "transfer," used in conjunction with 1) the references to Heppner's "takeover" and his "effective control" of GWG; 2) the use of money from "elderly and retired" individual investors; and 3) the references to bankruptcy in the previous paragraph, all suggest that Heppner and Beneficient improperly used the money of elderly and retired retail investors to enrich Heppner, to the detriment of those investors.

83.     This highly misleading description was written with actual malice.  When Gladstone asserted pre-publication that Beneficient "need[ed] to take that $230 million from GWG[,]" he (and his supervisor Scurria) was explicitly contradicted by Plaintiffs' representatives and warned the description was factually inaccurate—instead, the transaction described was an investment for value—and warned that the assertion that Beneficient "took" money from GWG supported a false narrative.

84.     Only two days later, and with full knowledge of the falsity of the assertion, Gladstone and *The Journal* published in the Article that GWG "transferred" $230 million to

Beneficient, a description virtually identical to his previously debunked position.  Despite knowing the truth, Gladstone and *The Journal* purposefully stuck with this false description because accurately describing the facts would not fit within their pre-conceived narrative and desire to give a misleading and false impression about Heppner and Beneficient.

85.    **Ranch-Related Falsehoods.**    Gladstone's and *The Journal*'s next paragraph explicitly links the so-called "transfer" to Beneficient with alleged personal benefits for Heppner; specifically, that these funds supposedly paid for his nearly 1,500-acre Ranch in Texas and "provid[ed] [Heppner] access to private jets among other benefits."

> Much of those capital contributions from GWG were then distributed to Mr. Heppner and his affiliated business entities, helping him repay debt he had incurred to buy and develop a nearly 1,500-acre ranch in Texas, and providing him with access to private jets among other benefits, according to people familiar with the matter and internal documents reviewed by the Journal.

86.    These statements are intentionally misleading and add to the misleading and false nature of the story because they omit critical details necessary to place the statements in context.

87.    The Article implies that the Ranch was paid for with the $230 million GWG investment (that Gladstone insisted on calling a "transfer") and that, therefore, Heppner, aided by Beneficient, bought the Ranch with unsuspecting retirees' hard-earned money.

88.    In reality, the Ranch was purchased in 2003, approximately 15 years prior to any investment by GWG in Beneficient.  Gladstone and *The Journal* were explicitly informed of the large gap in time between the GWG transaction and purchase of the Ranch pre-publication, and intentionally chose to persist with the highly misleading description.

89.    Additionally, the Ranch was not on Beneficient's balance sheet when GWG invested in Beneficient, having been separated over a year before and publicly disclosed with the

SEC in audited financial statements and their related notes as audited by both Whitley Penn and Deloitte.

90.     Therefore, the Article's implication that the Ranch was purchased or funded with money from retail investors "transferred" from GWG to Beneficient is false and defamatory.

91.     The Article makes other misleading statements about the Ranch to falsely portray Heppner and Beneficient as "fund[ing]" Heppner's supposed "lavish lifestyle" with the money of elderly and retired investors: Gladstone and *The Journal* falsely imply that Heppner and Beneficient have been misusing the corporate funds of Beneficient and GWG to Heppner's personal benefit to pay for the Ranch.

92.     First, the Article claims that "Beneficient took out $20.2 million in additional debt that it used to purchase a technology company owned by Heppner . . . [while] the technology assets were more than a decade old and were soon written off."

93.     Second, the Article claims that Beneficient "distributed to Heppner net assets of $59.1 million related to certain 'ranch and ranch-related business activities,' and later listed them on Beneficient's income statement as discontinued operations."

94.     Each of the statements, made in close succession to each other, imply that Heppner and Beneficient, consistent with the defamatory overall gist of the Article, have repeatedly abused corporate funds for Heppner's benefit, first by having Beneficient purchase a worthless technology company from Heppner for $20.2 million, and then by having Heppner take from Beneficient $59.1 million of soon-to-be-discontinued Ranch assets.

95.     These statements are false and leave a false impression.  This is because, contrary to the implication that they are worthless, those technology assets are in fact the foundation for the software developed and used by Beneficient to this day for many aspects of Beneficient's ongoing

operations, and therefore have considerable value; they were "written off" only for accounting purposes because they were not valuable in terms of a third-party sale.

96.     These assets and the related dollar amount were negotiated with large institutional third-party investors represented by the largest U.S.-based law firms and then subsequently audited to the contract agreements—the opposite of insider transactions.

97.     Similarly, the "distribution" that Beneficient made of the Ranch-related assets was in the context of the same third-party investment where the third party knew about—and indeed insisted on—the separation of the Ranch assets along with Heppner's family office and related investment assets from the ongoing operations of Beneficient.

98.     Therefore, contrary to the implications of the Article, neither transaction was the product of any wrongdoing by Heppner or Beneficient.

99.     **Compensation-related falsehoods.**  The Article also makes misleading statements about payments Beneficient made to entities related to Heppner: the Article alleges that "Beneficient has also made recurring payments to an entity that Heppner controls [Bradley Capital LLC] . . . including for reimbursement for private travel including the family members of designated executives . . . for both business and private use," and that "the money was used to pay for Heppner and his family and associates to fly in private jets, including trips to Southern California."

100.    These statements are intended to further the story's misleading theme that Heppner and Beneficient's misuse these corporate funds to enable Heppner's supposed "lavish lifestyle." Reporting only facts (or partial facts) consistent with this theme was Gladstone's and *The Journal*'s intention all along, as Gladstone's first written fact check contained references to

Heppner's so-called "lifestyle" that demonstrate he had already concluded Beneficient and Heppner were the wrongdoers.

101.    These statements are misleading because they omit facts necessary to understand them in their proper context; specifically, that Beneficient made the payments to Bradley Capital pursuant to six-year-old contracts (that predate any involvement by GWG by years) **that were created as a substitute for Heppner's salary and other payments**.

102.    It is false and defamatory to imply that Heppner and Beneficient used these payments as an improper conduit to enrich Heppner or that those payments have anything to do with GWG.

**Gladstone Publishes A Defamatory Tweet**
**Promoting The July 29, 2022 *Wall Street Journal* Article**

103.    On July 29, 2022, the same day he and *The Journal* published the Article, Gladstone tweeted the following misleading and defamatory statement:[11]

---

[11] Ex. A.

24



104.    As stated, the tweet, read either alone or in conjunction with the Article, gives the false and misleading impression that Heppner and Beneficient improperly and/or dishonestly used money from "elderly and retired" "retail investors" to "fund [Heppner's] lavish lifestyle," leaving those investors with "up to $1.3 billion in losses."

105.    This was a false statement of fact designed to give a false impression.  The phrase "fund his lavish lifestyle" is especially defamatory, because it is commonly understood in context to imply that Heppner and Beneficient are committing wrongdoing for the self-enrichment of Heppner.

106.     Gladstone's Twitter audience—and others in the community—have taken Gladstone's allegations at face value and now believe that Heppner and Beneficient acted improperly.

107.     To name just a few examples, one person on Twitter, upon reading the falsehoods contained in the Article and Gladstone's tweet concluded, in a clear reference to Heppner and Beneficient, that "**a man with a briefcase can steal more than a man with a gun**."[12]  The same user explicitly tied the Article to corporate malfeasance, stating "**I've been trading corporates for 30 years and I have seen a lot, but I can't recall a story with so much f\*\*\*ery baked into it as this one**."[13]

108.     Another prominent Twitter account with more than 30,000 followers republished another tweet from Gladstone promoting the Article[14] and summarized his conclusion that "**Texas CEO [Heppner] siphons millions from company to pay for his ranch.**"[15]

109.     Others on social media piled on with "likes" and their own replies, including that "**the mafia leaves less of a paper trail**."[16]  There are many other similar sentiments.

---

[12]     The      Kingfish      (@daKingfish_),      Twitter      (July      29,      2022), https://twitter.com/daKingfish_/status/1553056815574724609.

[13] The actual tweet used an expletive.

[14] In addition to Exhibit A, Gladstone published a tweet at 10:25 am on July 29, 2023.  The comments referenced in paragraphs 105–107 were in response to this 10:25 am tweet, which also linked to the Article and contained language substantially similar to Exhibit A.  A true and accurate copy of Gladstone's July 29, 2023, 10:25 am tweet is attached as **Exhibit F**.

[15]     Mr. Skilling      (@mr_skilling),      Twitter      (July      29,      2022), https://twitter.com/mr_skilling/status/1553173613896941568.  This tweet has since been deleted but a copy has been saved.

[16]     Up   and   to   the   Right   (@upandtotheright5),   X   (July   29,   2022), https://twitter.com/upandtotheright5/status/1553184018765533185.  This tweet was in response to a substantially similar tweet from Gladstone that Gladstone has since deleted.

110.    Indeed, these are the natural and predictable responses to Gladstone's tweet and article, which are designed to cause readers to believe that Heppner and Beneficient steal from the elderly to "fund [Heppner's] lavish lifestyle."

111.    Defendant Dow Jones was aware of Gladstone publishing, and encouraged him to publish, social media posts to promote his work—indeed, Gladstone frequently uses X to promote the articles he publishes in the *Journal*.[17]

112.    Given this, Dow Jones had an obligation to ensure that Gladstone did not knowingly or recklessly defame any of the subjects of his reporting.  Dow Jones recognized it had such an obligation to supervise the use of social media by all *Journal* reporters by—upon information and belief—establishing policies governing the use of social media by its reporters to promote pieces they publish in the *Journal*.

113.    Dow Jones breached its obligation to supervise Gladstone's activities in promoting his *Journal* articles on X by failing to take any steps to ensure the claims he was making about Beneficient and Heppner were accurate and recklessly disregarding the fact that the subjects of Gladstone's article (Beneficient and Heppner) has repeatedly debunked Gladstone's claims in communications sent to Gladstone's supervisor, Scurria.

114.    As a direct result of Gladstone's and *The Journal's* actions (including *The Journal's* failure to supervise Gladstone), Heppner and Beneficient has suffered severe reputational damage from these falsehoods.

115.    To avoid further harm and repair Heppner's and Beneficient's reputations, Plaintiffs' representatives have continued to provide Gladstone and *The Journal* with information

---

[17]    *See, e.g.*, Alexander Gladstone (@gladstonea), X (June 20, 2024), https://x.com/gladstonea/status/1803809712346988640; Alexander Gladstone (@gladstonea), X https://x.com/gladstonea/status/1783209893542994336

refuting and correcting Gladstone's claims, but Gladstone and *The Journal* have persistently and continuously refused to correct or retract the Article or remove the defamatory tweet.

**Defendant Republishes the July 2022 Gladstone Article by**
**Publishing Yet Another Misleading Article That Hyperlinks to**
**the July 2022 Article**

116.    On July 28, 2023, Gladstone published another untrue and misleading article in the *Journal* titled, *$2 Billion Default Followed Warnings to Everyone but Investors*.[18]  Between the date of the Article and the 2023 Article, on October 17, 2022, Gladstone and his editor Scurria traveled to Texas at Heppner's and Beneficient's invitation.  The meeting lasted for more than three hours and in large part involved discussions of the issues that now form the basis of this lawsuit.  Beneficient and Heppner explained to Gladstone and Scurria at length how the Article misrepresented Beneficient and Heppner and tried to set the record straight.

117.    The 2023 Article, which contained similar allegations of deception and misleading conduct directed at Beneficient and Heppner, contained hyperlinks to all of Gladstone's and *The Journal's* prior coverage of Plaintiffs, including the Article.  Despite the extensive discussion that Heppner and Beneficient had with Gladstone and Scurria in October 2022, the Article did not reflect anything discussed.  On his Twitter account, Scurria Tweeted a link to the 2023 Article (with its hyperlink to the Article) and tagged Gladstone's personal Twitter account, thereby encouraging his Twitter following to review all the prior "reporting" on Beneficient.

118.    The republication of the Article via hyperlink exposed the Article—and its false allegations that Beneficient and Heppner improperly gained control of money from "elderly and

---

[18] Alexander Gladstone, *$2 Billion Default Followed Warnings to Everyone but Investors*, The Wall Street Journal (July 28, 2023), https://www.wsj.com/articles/2-billion-default-followed-warnings-to-everyone-but-investors-fbf13873.

retired" "retail investors," and improperly used those funds to personally enrich Heppner and enable his supposedly "lavish" lifestyle—to an entirely new audience.

119.    The comments to the 2023 Article demonstrate that *The Journal's* readers took away the same defamatory meaning from the 2023 Article as they did from the Article.  One reader comments that "**The criminal acts are very well planned."**  Another remarks "[**i]if it walks like a Ponzi and quacks like a Ponzi, then it must be a ….**"  A third declared Mr. Heppner to be "**a common criminal, in a $10,000 suit**."

120.    *The Journal* linked the Article in the 2023 Article with the explicit purpose of exposing a new audience to the false and defamatory allegations in the Article.  Indeed, given that a year passed between the first publication of the Article in 2022 and its republication in 2023, the *Journal's* audience had significantly changed.  *The Journal* fully intended that readers of the 2023 Article would click on the hyperlinks and read its prior coverage on Beneficient and Mr. Heppner, including but not limited to the Article.  On information and belief, *The Journal*'s subscription pool had both added and lost individual subscribers to such a degree that *The Journal's* audience was materially different in 2023 than it was in 2022.  Discovery will show precisely how many readers from *The Journal* first accessed the Article via the hyperlink in the 2023 Article.

## Heppner and Beneficient Suffer Significant Harm
## Due To Defendant's False Accusations

121.    Unsurprisingly, Gladstone's and *The Journal's* false claims have been extremely damaging to Heppner's and Beneficient's reputations and business.

122.    As Gladstone and *The Journal* specifically intended, their false accusations harmed Heppner's and Beneficient's reputations with potential investors and business partners, clients, the business community, and the general public.

123.   As one example, Beneficient, through the work of Heppner and others, has actively sought investments from third parties.  One group of investors was interested in a potential investment in Beneficient but declined, and when so doing, cited the so-called "burn" from the "July article" as a reason.  The failure to secure investments that Beneficient otherwise would have secured but for the defamatory statements has cost Beneficient millions of dollars in lost opportunity costs, as well as significant lost time and out of pocket costs.  It is also illustrative of the harm that the Article has done to Plaintiffs' reputations.  Other investors have similarly specifically referenced the Article as a reason they would not invest in Beneficient.

124.   A second example occurred when a prominent Texas bank was preparing to give Beneficient a line of credit that was critically important for Beneficient's ongoing operations. During the approval process, the Article was mentioned as a factor in the relevant credit committee subjecting the transaction to additional scrutiny, the bank's chief credit officer requiring the president of the bank to personally approve the transaction, and the application eventually being rejected.  Because Beneficient failed to receive the line of credit due to the defamatory Article, it has had to furlough staff and has suffered other damage.

125.   Additionally, in the course of pursing business opportunities, numerous of Beneficient's and Heppner's potential investors and partners have referenced the Article and Gladstone's and *The Journal's* coverage in declining to pursue doing business with Beneficient and Heppner.  The business opportunities lost by entities specifically mentioning *The Journal's* coverage totals in excess of a billion dollars.

126.   Beneficient has also suffered significant out of pocket costs spent on public relations efforts and similar services due to the defamatory Article.

127.    Furthermore, Heppner's ability to be elected as a director of the board or into a leadership position for other public companies, particularly in finance companies, has been impaired.

128.    Gladstone's and *The Journal's* false and defamatory statements have also harmed Heppner's and Beneficient's other existing commercial relationships, have harmed their business standing, and have impaired their ability to enter into future commercial relationships.

129.    Gladstone's and *The Journal's* false and defamatory statements have also impaired Heppner's ability to attract co-investors to invest in his various ventures, depriving Heppner of business opportunities.

130.    In addition to the reputational harm and detrimental impact on Heppner's and Beneficient's business and reputations, Plaintiffs have been damaged by having to expend resources to respond to these defamatory statements.

131.    Gladstone's and *The Journal's* actions since the publication of the Article and the associated tweet have likewise demonstrated that they are engaged in a campaign to defame Heppner and Beneficient.

132.    Accordingly, Plaintiffs have been forced to bring this suit to vindicate their rights and set the record straight.

### COUNT ONE—DEFAMATION PER SE BY IMPLICATION FOR OVERALL MEANING (GIST) OF THE JULY 29, 2022 *WALL STREET JOURNAL* ARTICLE

133.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth fully herein.

134.    On July 29, 2022, Gladstone and *The Journal* published an article entitled, "An Asset-Management Merger Ended in Bankruptcy, While Its Architect Got $174 Million."  The statements in the Article are statements of fact of and concerning Heppner and Beneficient.

135.    The implication (or gist) of the Article, read as a whole, is that Heppner and Beneficient engineered a sham transaction between GWG and Beneficient that allowed Heppner to buy the Ranch and use private jets with these wrongfully obtained corporate funds—all at the expense of elderly and retired investors who now face $1.3 billion in losses.  This was a false statement of fact by implication.

136.    The Article can be reasonably understood by an objectively reasonable reader as having the proposed meaning in the prior paragraph.  This is because, as explained in full above, the Article selectively uses falsehoods, half-truths, and juxtaposes facts in misleading ways.  For example:

- The Article falsely claims that Heppner "promised to reinvigorate" GWG but "instead" "collected at least $174 million in cash . . . leaving individual investors ow[ing] $1.3 billion[.]";

- The Article falsely claims that Heppner and his associates "gained effective control of GWG" and then "transferred" $230 million to Beneficient;

- The Article falsely implies that Heppner had Beneficient improperly pay entities linked to Heppner to allow Heppner to use those funds for his own person use, including by allowing Heppner, his family, and his associates to enjoy private jets and other lavish benefits.

137.    The Article contains ample evidence that Gladstone and *The Journal* intended the defamatory inference by, among other things, juxtaposing facts out of chronological order, stating facts without context, and by employing other techniques designed to give a false impression.

138.    Furthermore, the Article does not clearly disclose the factual bases for the accusations it impliedly asserts; instead, the Article misrepresents or omits facts that would have disproven the defamatory implication.  Indeed, many of the true facts were explained to Gladstone and *The Journal* by Plaintiffs' representative before publication, yet Gladstone and *The Journal* chose to ignore the truth.

139.    The defamatory statements are not a recitation of other accusations about Heppner and Beneficient, but accusations made entirely by Gladstone and *The Journal*, despite their knowledge of facts to the contrary of the implication that he is trying to make.

140.    The defamatory statements were made with actual malice regarding the truth of the statements. Plaintiffs' representative repeatedly communicated with Gladstone and his supervisopr at *The Journal*, Scurria, in order to attempt to correct known misstatements in the Article and provide the truth, but those attempted corrections were ignored and/or rejected by Gladstone and *The Journal*.

141.    These statements are defamatory as they tend to injure Heppner's and Beneficient's reputations, lower them in the estimation of the community and deter third persons from associating or dealing with them, expose them to public hatred, contempt, ridicule, and financial injury, and impeach their honesty, integrity, virtue, and reputation.

142.    These statements are defamatory *per se* because they allege that Heppner and Beneficient are dishonest, engaged in sham transactions to enrich Heppner, and/or have committed crimes, which injure Beneficient and Heppner in their trade and profession.

143.    On July 28, 2023 Defendant published a second article in *The Journal* entitled, *$2 Billion Default Followed Warnings to Everyone but Investors*.  The 2023 Article contained a hyperlink to the Article, republishing it to a new audience.

144.    Given the passage of time, and upon information and belief, the composition of *The Journal's* subscribers materially changed between 2022 and 2023, both adding and losing individual subscribers.  *The Journal* republished the Article in 2023 to circulate it among this new audience.

145.     Heppner and Beneficient have also suffered real-world damages due to the Article, as explained in full in paragraphs 121–132.  In particular, the Article has adversely affected Heppner's and Beneficient's ability to conduct business.

146.     In view of the foregoing, Heppner and Beneficient are entitled to actual, presumed, and punitive damages in an amount to be determined at trial.

### COUNT TWO—DEFAMATION PER SE BY IMPLICATION FOR SPECIFIC STATEMENTS WITHIN THE JULY 29, 2022 *WALL STREET JOURNAL* ARTICLE

147.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth fully herein.

148.     On July 29, 2022, Gladstone and *The Journal* published an article entitled, "An Asset-Management Merger Ended in Bankruptcy, While Its Architect Got $174 Million."  The statements in the Article are statements of fact of and concerning Heppner and Beneficient.

149.     The Article has several specific defamatory statements that are of and concerning Heppner and Beneficient, including but not limited to:

- "GWG also transferred $230 million to Beneficient Co. Group LP, a financial-services startup founded and led by Heppner."

- "Much of those capital contributions from GWG were then distributed to Heppner and his affiliated business entities, helping him repay debt he had incurred to buy and develop a nearly 1,500-acre ranch in Texas, and providing him with access to private jets among other benefits[.]"

150.     These statements were false and/or designed to create a false impression.

151.     The first statement is false and defamatory because in the context of the article, the intentional use of the word "transfer" implies that Heppner and Beneficient improperly orchestrated a sham payment from GWG that they then wrongfully allocated to enrich Heppner, all to the detriment of "elderly and retired" investors.  In actuality, the transaction described as a "transfer" was an investment for value by GWG in Beneficient that has substantially gained in

value since it was made.  Gladstone intentionally chose the word "transfer" in order to make it appear that Heppner and Beneficient committed wrongdoing in this transaction.

152.    The second statement is false and defamatory because it suggests that Heppner and Beneficient used the wrongfully obtained funds from the so-called "transfer" for two personal benefits directed to Heppner: the purchase and development of the Ranch and access to private jets.  The words are carefully chosen to give the false impression that Beneficient, at Heppner's direction, transferred the funds to Heppner so he could use the money from the transaction to buy and develop the Ranch and gain "access" to private jets, which are collectively referred to by Gladstone by tweet as a "lavish lifestyle."  In fact, Heppner owned the Ranch for almost 20 years before the relevant transaction.  Similarly, Heppner did not "access" private jets because of GWG's investment in Beneficient; he has used private jets for decades, primarily for security reasons.

153.    The Article contains ample evidence that Gladstone and *The Journal* intended the defamatory inference by, among other things, juxtaposing facts out of chronological order, stating facts without context, and other techniques designed to give a false impression.

154.    Each statement in the Article listed in paragraph 163 does not clearly disclose the factual bases for the statement it impliedly asserts; instead, it misrepresents facts that, if included, would have disproven the defamatory implication.

155.    The defamatory statements are not a recitation of other accusations about Heppner and Beneficient, but accusations made entirely by Gladstone and *The Journal*, despite their knowledge of facts to the contrary of the implications he is trying to make.

156.    These statements can be reasonably understood by an objectively reasonable reader as having the proposed meanings set forth above because, as explained in full above, the Article selectively uses falsehoods, half-truths, and juxtaposes facts in misleading ways, and because

Gladstone and *The Journal* were told by Plaintiffs' representatives that *The Journal*'s readers would form this understanding, which they did then form.

157.     The defamatory statements were made with actual malice regarding the truth of the statements. Plaintiffs' representative repeatedly communicated with Gladstone and his supervisor at *The Journal*, Scurria, to attempt to correct known misstatements in the Article and provide true facts, but those attempted corrections were ignored and/or rejected by Gladstone and *The Journal*.

158.     These statements are defamatory as they tend to injure Heppner's and Beneficient's reputations, lower them in the estimation of the community and deter third persons from associating or dealing with them, expose them to public hatred, contempt, ridicule, and financial injury, and impeach their honesty, integrity, virtue, and reputations.

159.     These statements are defamatory *per se* because they allege that Heppner and Beneficient are dishonest, engaged in sham transactions to enrich their Heppner, and/or have committed crimes, which injure Heppner and Beneficient in their trade and profession.

160.     On July 28, 2023 Gladstone and and *The Journal* published a second article entitled, *$2 Billion Default Followed Warnings to Everyone but Investors*.  The 2023 Article contained a hyperlink to the Article, republishing it to a new audience.

161.     Given the passage of time, and upon information and belief, the composition of *The Journal's* subscribers materially changed between 2022 and 2023, both adding and losing individual subscribers.  *The Journal* republished the Article in 2023 to circulate it among this new audience.

162.     Heppner and Beneficient have also suffered real-world damages due to the Article, as explained in full in paragraphs 121–132.  In particular, the Article has adversely affected

Heppner's and Beneficient's ability to conduct business, obtain credit, and obtain third party investment, and have caused significant out-of-pocket costs.

163.    In view of the foregoing, Heppner and Beneficient are entitled to actual, presumed, and punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter an award in Plaintiff Brad Heppner's and Plaintiff Beneficient's favor, and against Defendant Dow Jones & Co., Inc. as follows:

(1) awarding Heppner and Beneficient compensatory damages in an amount to be determined;

(2) awarding Heppner and Beneficient punitive damages in an amount to be determined;

(3) awarding Heppner and Beneficient all expenses and costs, including attorneys' fees; and

(4) such other and further relief as the Court deems appropriate.

## JURY DEMAND

Pursuant to Rule 38(B) of the Federal Rules of Civil Procedure, Plaintiffs request a trial by jury on all triable issues.

Dated: July 26, 2024                       Respectfully submitted,

*/s/ Andrew W. Stinson*
Andrew W. Stinson
State Bar No. 24028013
RAMEY & FLOCK, PC
100 E. Ferguson Street, Suite 500
Tyler, TX 75702
903-597-3301
andys@rameyflock.com

Thomas A. Clare, (*pro hac vice*)
David Sillers (*pro hac vice*)
Steven J. Harrison (*pro hac vice*)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
202-628-7400
tom@clarelocke.com
david@clarelocke.com
steven@clarelocke.com

*Attorneys for Plaintiffs Beneficient and*
*Brad Heppner*